## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Matthew Shawn Borke
1115 Mason St.
Flint, MI 48503,

     Plaintiff

v.

                                      Case No. _____

Kelcy Warren, Executive Chairman
And Board Chairman
Energy Transfer
5323 Park Lane
Dallas Texas 75220

Energy Transfer
8111 Westchester Drive
Dallas, Texas 75225

Kevin James Mayberry, CEO
Leighton Security
403 Elm St.
Honey Grove, TX 75446-2126

Gary Washburn, Operations Manager
Leighton Security
2706 N. 875 St.
Ramsey, Illinois 62080

Leighton Security
403 Elm Street
Honey Grove Texas 75446,

     Defendants.

### COMPLAINT AND JURY DEMAND ENDORSED HEREON

### Introduction

1.  this is a civil rights action for damages against the named Defendants for

1

targeting, harassing, surveilling and imposing punishments and retributions upon Plaintiff Matthew Shawn Borke because of his environmental activism and for violating his civil rights under 42 U.S.C. § 1985 and his rights under state law, causing him personal and pecuniary damage for having exercised his constitutional rights of free speech and association as a citizen of the United States.

**Parties**

2. Plaintiff Matthew Borke, ("Plaintiff"), a professional chef and environmentalist, is a resident of Flint, Michigan.

3. Defendant Kelcy Warren ("Defendant Warren") is the Executive Chairman and Chairman of the Board of Defendant Energy Transfer ("Defendant ET"), formerly known as Energy Transfer Partners. Both are based in Dallas, Texas.

4. Defendant Energy Transfer ("Defendant ET") is a midstream wholesale oil and gas pipeline services company that has owned and organized the permitting, construction, and security of several major interstate pipelines since 2016, including the Trans Pecos Pipeline, the Dakota Access Pipeline, the Rover Pipeline, the Mariner East 2 Pipeline, and the Bayou Bridge Pipeline. ET's reported assets totaled just under $1 trillion in 2019.

5. Defendant Kevin James Mayberry ("Defendant Mayberry") is the CEO of Defendant Leighton Security ("Defendant Leighton"). Defendant Mayberry also owns a pipeline monitoring company, Echelon Helicopters, Inc., and a Jeep vehicle aftermarket company called Maximum Elevation Off-Road.

6. Defendant Gary Washburn ("Defendant Washburn") is the Operations Manager for Leighton Security. Defendant Washburn is also an officer for the Illinois State Police.

7.  Defendant Leighton Security Services, Inc. ("Defendant Leighton Security") is based in Honey Grove, Texas and at all times of which complaint is made, was a contractor providing security for Defendant ET's projects.

## Jurisdiction & Venue

8. This action is brought under 42 U.S.C. § 1985 and the First, Fourth, and Fourteenth Amendments to the United States Constitution. Jurisdiction of this Court is based on 28 U.S.C. §§ 1331 and 1343. Venue is proper within the Eastern District of Michigan because a substantial portion of the events or omissions giving rise to Plaintiff Borke's claims occurred within this district and because during the time said acts or omissions occurred, one or more Defendants were present through their employees, agents or contractors within the District.

9.  The Court has pendent jurisdiction over state law claims under 28 U.S.C. § 1367.

## Factual Allegations

10. Matthew Shawn Borke is a member of Michigan Residents Against the ET Rover Pipeline ("MRAtETRP"), a grassroots group of residents of southeastern Michigan which is involved in sharing facts and raising public awareness about activities concerning Energy Transfer Partners' Rover gas mega-pipeline construction. MRAtETRP has opposed the construction of Rover since public discussions began in 2014.

11. Plaintiff Borke for several months in 2016-2017 was an activist participant in the Native American protest and occupation against construction of Defendant ET's Dakota Access Pipeline (DAPL) in and around Cannonball, North Dakota.  Defendant Leighton Security was a primary security contractor with ET during that period.

12. Plaintiff served as a chef to DAPL protestors throughout the duration of his presence at the activist camp in North Dakota.

13. Defendant Leighton Security is Defendant ET's general contractor of security out of Honey Grove, Texas.

14. Defendant ET monitored Plaintiff's activities and whereabouts, as well as those of hundreds of other protesters during ET's construction of the Dakota Access Pipeline.

15. During his months in North Dakota, Plaintiff participated in various acts of protest, including peaceful acts and attempted acts of civil disobedience opposing completion of the pipeline. Plaintiff, along with scores of other protestors, was from time to time subjected to attacks involving contract security forces paid by ET to use trained security dogs and to commit acts of brutality including, and the use of pepper spray and other munitions, as well as high-pressure water spray in subfreezing temperatures and other munitions. Protesters were commonly criminally charged.

16. In February 2017, Plaintiff was charged at a DAPL encampment for the claimed misdemeanor of interfering with a governmental function, which was ultimately dismissed.

17. Tiger Swan is a paramilitary private security firm which was hired by ET to advise law enforcement in North Dakota. Tiger Swan was found guilty of working

illegally without a state-required license to perform security operations in North Dakota during DAPL construction, but despite the infraction, continued to direct governmental police forces against the protesters.

18. State laws typically require security firms to register with the government so their identities and potential liability for any harm done to persons or property can be tracked, and so they do not inadvertently run afoul of police for impersonating law officers.

19. On October 20, 2016, Defendant ET used a water cannon, a sound cannon (known as a Long Range Acoustic Device), tear gas, pepper spray rubber bullets, bean bag cannons and other munitions to quell protestors in sub-freezing temperatures.

20. Tiger Swan advised and led daily briefings with law enforcement personnel in North Dakota throughout the time Plaintiff was present. Tiger Swan and other private and governmental police repeatedly attempted to infiltrate the DAPL protest encampments, to exploit Native versus non-Native rifts and tribal divisions, and use psychological operations to attempt to break up and delegitimize the anti-DAPL movement. Personnel of Tiger Swan and others stated they were using counter-insurgency tactics to combat what they called a "jihadist insurgency." Even during encounters between security forces and protesters, police admitted that from their perspective they were conducting "a war." Many of their methods of warfare are illegal under international law, such as the Geneva Protocols and the1993 United Nations Chemical Weapons Convention (CWC).

21. About early December 2016, employees, agents or contractors of Defendant ET, with supportive national guard troops, started pointing a Mobile Anti-Aircraft Missile

launcher known as the Avenger Defence System at Plaintiff and scores of other protesters.

22. On February 23, 2017, Plaintiff Borke was ordered to come outside his home at one of the anti-DAPL encampments with his hands in the air. Upon stepping outside, he found that roughly 15 men in military fatigues had submachine guns trained on him. They wore no insignia, badges, or name tags. They handcuffed Plaintiff with zip ties and arrested him for "interfering with a government function." He was one of 46 people arrested that day. Also on February 23 his electronic communication devices were confiscated; this property was not returned to him until June 27, 2018, when all criminal charges against him were dropped.

23. Shortly after February 23, 2017, Plaintiff's tent residence at the DAPL encampment was bulldozed and most of his belongings destroyed. He managed to reclaim his old automobile and reluctantly returned to his parents' home in Michigan because his home in North Dakota was gone.

24. Commencing in March 2017, Plaintiff began attending meetings of the Michigan Residents Against the ET Rover Gas Pipeline , the Rover pipeline being another megapipeline project of Defendant ET. The group's members were principally from Livingston and Washtenaw counties of Michigan, in the vicinity of Pinckney and Silver Lake.

25. At about the same time, the Livingston County sheriff's department announced that it had entered into an agreement with agents or contractors of Defendant ET and that deputies were providing security service at the construction sites of the Rover pipeline. The arrangements were made with the Sheriff's Department

through Defendant "Layton" Security. Layton is misspelling of Defendant Leighton Security's corporate name, and is a public misrepresentation.

26. The Livingston County Sheriff contracted to provide security for Rover and began to work in March 2017 at the rate of $60 an hour, in uniform and using departmental vehicles. Overall, the Livingston County Sheriff was paid at least $270,000 for the contract with Defendant Leighton.

27. In April 2017, during construction of the Rover pipeline in Ohio, the Tuscarawas River was polluted with millions of gallons of pipeline tunnel drilling fluid contaminated with diesel fuel. Defendant ET was in the process of drilling a pipeline tunnel beneath the river, and attributed the diesel fuel contamination to sabotage. Estimates of the drilling fluid spill ranged as high as 500 million gallons of drilling fluid because of the potential for large amounts being lost underground in tunneling. This incident has been a continuing matter of litigation involving ET and the Ohio Attorney-General, not because of ET's erroneous construction practices but because ET maintains that the State of Ohio has no authority to enforce its environmental laws against ET when building a FERC-licensed gas megapipeline.

28. On May 7, 2017, the National Sheriff's Association hosted a webinar by Paul D. Laney entitled "Protest on the Prairie: Law Enforcement Response and Lessons Learned" about North Dakota law enforcement tactics and strategy for protecting ET's construction. Paul D. Laney expressed law enforcement officers should be preparing for war.

29. On July 12, 2017, Michigan Department of Environmental Quality spokeswoman Melody Kindraka expressed that "Michigan DEQ is hoping residents in

the Silver Lake area can be the agency's extended eyes and ears and report anything unusual while the Rover pipeline is being constructed, such as excessively muddy water."

30. MRAtETRP members construed this to mean they had been invited by Michigan's environmental regulatory agency to monitor the environmental compliance of Rover pipeline construction in public service to the local community.

31. Defendant ET, through its agent Defendant Leighton Security, attempted to contract with the Washtenaw County Sheriff for security services. The Washtenaw Sheriff declined because the Washtenaw County Commissioners had publicly opposed the Rover pipeline in certain of the county's districts.

32. Because Plaintiff Borke had experienced considerable abuse from Defendant ET's contractors in North Dakota during the construction of DAPL, he wanted to avoid such experiences either against himself or others.

33. Police officers in Michigan communities near Rover construction sites told members of the public that they were increasing their presence due to the potentiality of protestors. Residents in the Pinckney and Silver Lake area were not used to seeing police present continuously. Baseless rumors began to circulate in July 2017 that protestors were seen throwing rocks at ET workers and police.

34. As Defendant ET acquired right-of-way real estate for the Rover pipeline, property owners who sold ET property were bound, upon information and belief, by nondisclosure terms which made it difficult for people to communicate with their neighbors and others about ET activities and intentions.

35. Steve Sokal, the chief executive officer of Progressive Solutions Group, a subcontractor of Defendant Leighton for the Rover project, posted to his Facebook account on or about August 31, 2017 pictures of "what protestors should expect." There were three pictures with the meme that "Whenever these people in masks show up (protestor picture), they should be greeted by these people in masks (militarized law enforcement picture), who should send them to these people in masks (surgical operation room picture)."

36. Residents living in the path of Rover complained repeatedly to police about illegal trespass activities by Defendant ET or its contractors. Sheriff's deputies in Livingston and Washtenaw counties would respond to complaints, stating to the residents that ET had a job to do, and if there was any problem, it is a civil and not criminal matter. One resident even jumped in front of an ET truck to slow it down since they were continuously speeding through a 25 mph zone on a lakefront road.

37. In early July 2017, Plaintiff Borke was invited by a property owner to camp indefinitely on that person's private property in the vicinity of Silver Lake, near the planned Rover right-of-way.

38. Shortly following, the next door neighbors told Plaintiff's hosts that they were housing dangerous criminal protestors that were throwing rocks at construction workers and potentially even at law officers.  The neighbor was rumored to have heard this from Michigan State Police.

39. Plaintiff Borke was contacted by four adult male next-door neighbors, who did not mention the rock throwing allegations but did confirm that Plaintiff was one of the

protestors they had heard from the Michigan State Police who had protested ET's DAPL construction activities in North Dakota.

40. Because Plaintiff did not intend to cause a larger wedge between the local community that ET was already breaking apart, he moved to Crooked Lake Campground in Pinckney State Park.

41. On July 7, 2017, there was a public rally and information session at the Young Men's Christian Association (YMCA) Camp Birkett on Silver lake to organize opposition to ET's intentions of installing the Rover natural gas megapipeline 300 feet from the YMCA children's camp, which meant in the event of a major pipeline explosion that people at Camp Birkett might fall within the 1/4 mile-radius "incineration zone." YMCA had received no public notice from ET about the project coming near their property. No officers were in attendance.

42. On July 12, 2017, one Steve Hernandez drove up to a residential violations training where local residents were being taught how to recognize a violation and what the MDEQ meant by "especially in the case of muddy waters." Steve Hernandez claimed he had family in the area and was concerned about the ET construction.

43. On July 13, 2017, ET security infiltrated the Michigan Residents Against ET Rover Gas Pipeline meeting. Mr. Borke respectfully asked ET workers to leave, but they refused. They were believed to be Steven Sokal and Steve Hernandez. Both Steves used fake last names on the sign-in sheet.

44. On or about July 15, 2017, Plaintiff Borke was welcomed to stay on another resident's private property until he could move to the Crooked Lake Campground for the next available campsite reservation which began on July 16.

45. On July 20, 2017, ET reported vehicle sabotage to its contractor, the Livingston County Sheriff's Department. The sabotage supposedly happened in front of the private property Plaintiff Borke had moved away from on July 16.  The Sheriff's report stated three bulldozers were damaged, estimated at $80,000 each. No Vehicle Identification Numbers were included in the Sheriff's investigation report, nor were any notes or reference to questioning of the property owners who had allowed Borke to camp on their property. ET contractors, employees or agents told the Sheriff they believed someone had put sand in their gas tank.

46. On or about July 24, 2017, Plaintiff observed a gentleman walking around his Crooked lake campsite wearing long sleeves, a hood, baseball cap, facial coverings, and sunglasses, all of which was unusual because it was nearly 100 degrees F. that day. Mr. Borke believes the man was Steve Hernandez.

47. Washtenaw County Sheriff Lt. Lisa King appeared at Plaintiff's campsite on or about July 25, 2017 at the Crooked Lake Campground to request his presence at the Washtenaw Sheriff's Office, stating that the Sheriff would like to speak to him.

48. On July 26, 2017, Plaintiff was greeted at the Washtenaw County Sheriff's Office by Washstenaw and Livingston Sheriffs, State Police, and Sheriff Jerry Clayton. The Sheriff told Plaintiff Borke he wanted to assure Borke his rights to protest were protected. There were about 11 officers. No allegations of sabotage or violence were mentioned during the meeting.

49. Plaintiff showed Sheriff Clayton the press release from the Michigan Department of Environmental Quality (MDEQ) asking for residents' "eyes and ears" to monitor for environmental violations during the pipeline construction.  He also asked the

officers if there is something they would like the residents to wear to assure peaceful communications between all parties involved. The police stated they didn't care what residents wore, and that they would show up on behalf of whomever called them first. Plaintiff asked them if they would be willing to leave their weapons in their vehicles when approaching residents and the police chuckled in reply. Officers told the Plaintiff they would monitor his facebook for events.

50. During the meeting, Plaintiff requested a restraining order against Steve Hernandez. The officers responded that he could not file for a restraining order against Mr. Hernandez. The police officers did not indicate that they knew who Mr. Hernandez was nor that Livingston Sheriff's Officers were working for Leighton. Mr. Hernadez turned out to be working security for ET.

51. Plaintiff was aware that the Livingston County Sheriff's office was under contract with Defendant ET at the time of this meeting. During the meeting, roughly 4 of the officers sat behind laptop computers, apparently noting down or otherwise recording the meeting. Livingston County Undersheriff Jeffrey Warder, who signed the contract to work for Leighton, was also in attendance in the meeting.

52. Plaintiff's requests for documents related to this meeting under the Michigan Freedom of Information Act have yielded few records except a couple of emails between Lt. King and Sheriff Clayton titled "protester", with content only including "meeting confirmed with protester."

53. After leaving the meeting, Plaintiff received an email from a local resident stating "The State Police told several of the East Shore neighbors last night that there have been acts of vandalism in the section east of our houses, and asked the neighbors

to spread the word to the rest of us that we should expect to see a lot of the police for the next while to prevent further sabotage."

54. On August 26, 2017, 50 or more citizens, many from the Silver Lake area and including Plaintiff Borke went on a protest hike along the Potawatomi Trail, part of Pinckney State Park Recreation area. The Trial passes through ET's Rover easement, which at the time which was an active site of pipeline construction. The hike was advertised on Facebook.

55. The Trail is a well-traveled bicycle and hiking trail that remained open to -- and continued to be used by -- the public, despite the Rover construction.

56. When the hikers arrived at the portion of the trail that crosses ET's easement, Washtenaw County sheriffs were called by ET. Sergeant Fox approached the protesters' liaison and told them if they did not get off the trail, then everyone was going to be arrested.

57. State Police soon arrived and, following discussion with the deputies, decided they did not have a vehicle large enough to transport the group to jail. Sergeant Fox eventually stated to the protester liaison that he was completely unsure of the rules, because ET was unsure of the rules.

58. On September 22, 2017, agents, employees or contractors of ET called the Washtenaw Sheriff, and a deputy who arrived onsite on Losey Lake Trail, part of Pinckney State Park Recreation area, to tell Mr. Borke that he could not walk on the Losey Lake Trial, a public trail that was kept open to the public during construction. The officer told Plaintiff that he (the officer) was onsite for Plaintiff's safety. Plaintiff asked the officer if he could advise the construction workers to fix their safety flags that were

down. The safety flags are a marker to ensure heavy machinery does not hit the power lines above the construction easement. The officer told Plaintiff to call someone else about that issue but didn't know who he should call. The officer then told Plaintiff that he should get off the bike trail and walk on the road.

59. On September 30, 2017, YMCA Camp Birkett held a second protest rally. No one from law enforcement was in attendance.

60. During the first week of October 2017, ET began a construction process called "metal piling" which consists of jackhammering sheet metal roughly 30 feet on the ground to create walls to install the 42" diameter gas pipe 14 feet deep in the ground. The procedure creates localized earthquakes and severe noise for some distance from the worksite. Within the first three days of the beginning of the piling work, the house across the street from the YMCA kids camp caught fire. The cause was ruled to be an electrical fire by the Fire Marshal, but there was no investigation as to whether construction activities caused the fire. The house had just been renovated except for the electrical lines.

61. On October 3, 2017, a fire began in a quarry near Silver Lake that contained ET equipment storage, and local residents sighted a fellow they began referring to as Angry Vile Guy (AVG). The fire, in a burn pile of various items, continued to smolder for days.

62. Plaintiff Borke communicated with MDEQ's Air Quality Division (AQD) agent Jennifer Dickson about the burn pile. Several residents also called about the heavy smoke from it by calling an MDEQ emergency response line known as PEAS.

63. This chemically-laden fire continuously burned or smoldered for the following week. Despite this, Washtenaw Deputy Sheriff Lisa King about the fire told Plaintiff, "don't worry about it."

64. Jennifer Dickson of the MDEQ Air Quality Division told Plaintiff that she arrived on-site to take samples of burning materials 5 times and that the Dexter County Fire Marshal Smith and Washtenaw Sheriff Lt. Lisa King would not allow her to take a sample even though it fell under her jurisdiction. The burn pile was believed to be composed of ET construction materials called "mud mats" that are supposed to be disposed of at chemical waste facilities due to the chemical treatment that is applied to the wood.

65. One Silver Lake resident had an interaction with the man known to locals only as Angry Vile Guy (AVG). As the resident was photographing the easement that would later be found to be a contamination zone, AVG slammed on his vehicle's brakes, jumped out of his truck and proceeded to scream at the resident. The resident was able to record roughly 13 seconds as the man screamed "You bitch, cunt, whore. Get the fuck outta here." The resident attempted to file a complaint with the Washtenaw Sheriff's Department. The officer on the phone refused to take a report unless an officer could show up at her house in person. The resident feared that a squad car pulling into her driveway would notify AVG where she lived.

66. On October 7, 2017, Silver Lake residents reported ET to the Michigan Department of Natural Resources for maintaining unsafe bridges across both the Potawatomi and Losey Lake trails in Pinckney State Park. Bridges were made by laying mud mats across a roughly 14-ft. trench, creating a very narrow two-foot-wide bridge

over the trench. The trails had no sign of closure or construction and were supposedly open and in operation as biking and hiking trails. ET created a safe bridge on Potawatomi Trail after being reprimanded by MDNR.

67.  On October 9, 2017, Livingston County deputies began 24/7 security at the Hell/Portage Creek Horizontal Directional Drilling (HDD) site, where a tunnel was bored beneath the creek bed for the Rover pipeline. The HDD sites were the areas that MDEQ had been most concerned about when they requested residents' "eyes and ears" to monitor for muddy water.

68. A private property owner nearby had invited Plaintiff to camp on private property on Hell/Portage Creek. Livingston County deputies providing security to protect ET's HDD equipment were roughly a quarter mile from where Plaintiff was camping. It became clear that the Livingston deputies were present to keep local residents who were volunteering as citizen monitors away from Hell/Portage Creek. On October 26, 2017, deputies approached citizen monitors, warning them away from the Hell/Portage Creek public waterway. Deputies frequently were present near or driving by Plaintiff's encampment, stopping him when he was on foot along public thoroughfares to warn him not to trespass on the Rover easement.

69. On October 27, 2017, a property owner who lived across the street from ET's HDD activities under Hell/Portage Creek, phoned MDEQ's RRD Mary Miller wondering if anyone from the state was monitoring ET's HDD activities. He had approached workers at the site, asking if there were any monitors present.  They told him that it was none of his expletive business.

70. On November 24, 2017, a Livingston County Sheriff's detective was waiting on the road in front of where the Plaintiff was staying to question a resident citizen monitor about Plaintiff. The resident was attempting to lawfully observe and monitor the status of Hell/Portage Creek. The detective told the resident that he was there to protect her from trespassing.

71. All interstate pipeline permits require state environmental water resources permits before construction. In Michigan, that means the Environmental Water Resources Division (WRD) within the MDEQ, whose employees are educated in water withdrawal and soil erosion. Water contamination and geology specialists in 2017 were located within the Remediation and Redevelopment Division (RRD) and not included in environmental oversight. Environmental oversight of pipelines relies on third party specialists that are paid by the pipeline company and serve as federal (FERC) oversight on location.

72. On October 11, 2017, Plaintiff Borke reported ET to state and federal environmental agencies for releasing contaminants into the local watershed after smelling a strong odor of gasoline in water being released from the Rover construction site. Plaintiff met with MDEQ Water Resources Division agent Matthew Konieczki near the easement site, and Konieczki agreed with Plaintiff that water coming from the easement had a strong odor of gasoline. But when ET's onsite environmental specialist asserted that the odor was swamp gas, Konieczki stated he was not qualified to confirm contamination issues and had to defer to knowledge from the onsite environmental specialist. However, Konieczki stated in internal MDEQ emails that he experienced the gasoline odor.

73. On October 12, 2017, MDEQ Remediation and Redevelopment Division (RRD) Senior Analyst Rebecca Taylor arrived on site. Taylor drew several samples of water from the easement and outfall and ordered ET to shut off their pumps and explained to the pipeline onsite specialist the remediation process that is acceptable within Michigan Regulations, which included a carbon filtration. The onsite specialist expressed to Taylor that the gasoline smell was swamp gas or "natural occurring odors." Taylor expressed to him that his pumps needed to be turned off. She estimated at least 100 gallons a minute were pouring into the watershed. Taylor accepted a water sample from Plaintiff that he had captured the day before for comparison of contaminants. Taylor took the samples to a certified lab for analysis.

74. On October 12, 2017 Plaintiff emailed Washtenaw County's Lt. Lisa King to inform her of several current issues, including the gasoline contamination, the burning pile of alleged ET construction mud mats in a quarry, a recent house fire next to ET's easement, and a residential harassment complaint against Angry Vile Guy.

75. Lt. King responded and agreed to meet with the harassed resident and Plaintiff at the Pinckney State Beach parking lot to take a report. She also stated "the gravel pit is occupied by wood chips only." Lt. King watched the video of the resident who was accosted by AVG and agreed that it looked really violent. She stated that she would look into it since Plaintiff provided her AVG's licence plate number. She evidently never conducted any investigation. No report was found in response to Plaintiff's FOIA request, nor has Lt. King ever responded to any of Plaintiff's several requests for the report number.

18

76. On October 13, 2017, the MDEQ cited Defendant ET for a violation (MDEQ VN-007795) of the Clean Water Act for releasing petroleum contaminants into the local watershed. The MDEQ stated that the source of the petroleum was likely to be contaminated groundwater from a release at a former gas station near the Rover pipeline route. According to the MDEQ, "The contaminated groundwater is being captured through the dewatering process, which is being employed for the pipeline installation and is being discharged to the wetland.Regardless of the potential source, the presence of odor and sheen indicates a discharge of petroleum-contaminated water from the dewatering activities being conducted on site.

77. The area of contamination release was roughly 300 feet from YMCA Camp Birkett, the location identified by Plaintiff. Defendant ET was ordered to cease unauthorized discharges of contaminated water, submit a National Pollution Discharge Elimination System application to the agency and register the water withdrawal as necessary.

77. ET stopped releasing contaminants from that particular well, but publicly stated that the company had no legal obligation to obey MDEQ because ET was federally regulated and that it had agreed to the stop work order to support a "neighborly relationship."

78. ET continued to pump water from a site about 20 feet away and from other nearby sites without a large quantity water release permit into the nearby wetland, which drained into Hell/Portage Creek, a tributary within the Huron River watershed. The pumping from this second well continued for days and MDEQ finally estimated that at least 27,000,000 gallons of contaminated water was discharged into the watershed

via Hell/Portage Creek. ET was only permitted to release only 3,000,000 gallons of uncontaminated water per month without a permit. ET's pumps ran for approximately 4 days. These several pumping sites all were reported by ET as beneath the 3,000,000 gallons per month total, an impossibility according to MDEQ's calculations. When Plaintiff contacted MDEQ about the ongoing presence of several ET pumping sites all in close proximity, he was told, "it's just water. Don't worry about it" by the Water Resources Division (WRD).

79. On October 14, 2017, Leighton Security and Onsite FERC Environmental Compliance Monitor created a document called a "security assessment," which claimed Plaintiff was seen "pouring petroleum or fuel" on their property. Leighton forward this report on to its contractor, the Livingston County Sheriff.

80. ET's Jennifer Street, Operations and Engineering Services, emailed the Director of the MDEQ, Heidi Grether, a report, the subject of which was "Rover 10.13 NOV - Meeting Request, which stated, "our two initial field screen test results indicate there is no presence of hydrocarbons in the water."

82. On October 15, 2017, the Livingston County Sheriff's office shared a Leighton Pipeline Security Detail Incident Update which included a "security assessment" to Law Enforcement, which included Plaintiff's residence address, vehicle, and license plate number. A photo of Plaintiff accompanied the Leighton Security assessment. It was a picture taken during his time in North Dakota during the DAPL protests.

83. Livingston County Sheriff Jeff Krysan received the Leighton security assessment report through his personal email account, and promptly emailed it to his

official (government) email account, then forwarded it to Livingston County Officer Eric Sanborn to forward to other Sheriff agents.

84. The "Security Assessment" claimed that "Protestors have attempted to shut down the pipeline by way of sabotage, disinformation and disrupting job quality and performance." And also stated that a "male {who was identified in the report as Plaintiff] was carrying some type of containers which we believe contained some type of oil or fuel which was dumped into the water decon tank on site. Also discovered was a makeshift camp which is believed to be used by Protestors attempting to disrupt the project." It further stated that "On October 13th, 2100 hrs, several local citizens on the Washtenaw County S. end were verbally harassing the security on Dexter Town Hall Rd. It is believed the protestors and vandals have a base residence." The "Security Assessment'' described Plaintiff, who had found and reported ET's illegal water contamination.

85. Plaintiff indeed was present near Hell Creek on the day mentioned in the report, but he did nothing to contaminate the water. He was gathering water samples to turn over for the MDEQ's investigation, because the water being illegally pumped demonstrated an oily sheen and was contaminated. The continued pumping by ET, which had shut down only one pump among several in response to the MDEQ cease and desist notice, was likely illegal. Plaintiff was acting lawfully and prudently and within his right as a person who uses water from the Huron River watershed and protects the environmental values of the commons. He conducted his acts in broad daylight.

86. Despite being defamatorily smeared and accused in the security assessment, a document he did not know existed until summer 2020, and having that assessment

transmitted to county law enforcement officers, no law enforcement officer or private security guard ever contacted Plaintiff to investigate why he was seen near the Rover construction site on that day. Plaintiff was never interviewed, charged or prosecuted for any supposed misdeeds related to his presence near the Rover site.

87. On October 12, 2017 Plaintiff emailed Washtenaw County Sheriff's Lieutenant Lisa King of the destruction of the "makeshift camp" that is referred to in the "Security Assessment." The residents stumbled across the little camp while investigating the overflowing water coming from the Rover pipeline easement on October 11. Because the little camp was roughly 300 yards away from YMCA Camp Birkett, a children's camp, the residents assumed it had been built by children. The residents cried when they saw it was destroyed by construction.

88. On or about October 16, 2017, Plaintiff communicated with the FERC Rover Project Manager Kevin Bowman via telephone in Washington, D.C. Plaintiff asked Bowman the logic of ET's continuing to pump millions of gallons of water a day into the Huron River 20 feet from where ET had pumped contamination water. MDEQ's active theory was that ET was dewatering an underground contamination plume. Plaintiff believed ET was using a "clean water" pump to pump out contaminated underground water, since the "contaminated water" pump had been shut down by MDEQ's order. Bowman agreed that it was not logical and asked Plaintiff what he thought they should do about it. Plaintiff suggested ET turn off the "clean water" pump, because he believed it was still delivering contaminated water.

89. Around this time, many residents of the Silver Lake area called MDEQ to ask ET to shut down the pump. But ET kept the pump operating until November.

90. ET resumed dewatering activities in early December 2107, after proper filtration was set up and permits were approved. But even then, MDEQ told ET to stop on the first day of renewed operations, because ET was not filtering water across the street from its second pump.

91. All water test results from MDEQ sampling showed persistent petroleum contamination in the water for the duration of ET's construction at that location, from both pumps. MDEQ is still investigating underground contamination plume there at present, and states it is much bigger than they expected.

92. On October 18, 2017, ET called the Washtenaw Sheriff's Office, and deputies were dispatched at 5:00 a.m. to the construction site, where they told local residents that "eco-terrorists" were out destroying ET's property.

93. According to Washtenaw Sheriff's body camera footage from that police response, the officer walked onto ET's Rover easement property into a gun club near Silver Lake where there were roughly 50 campers for duck hunting season. In fear for his life, the officer withdrew his gun from his holster on a 3-D cougar target while being guided by a Leighton Security Agent. Leighton told the officer that Leighton was not able to contract with the Washtenaw County Sheriff for security like they had in Livingston County because there was a problem with protesters on the Washtenaw County Board of Commissioners. The Leighton agent told the officer that the ET security contract was for over a billion dollars, adding that "My boss is a state trooper (Defendant Gary Washburn) in Illinois," and that ET "buys us whatever we want."

94. On October 19, 2017 a Rover construction worker, appearing to be filming, walked past Plaintiff near the Rover construction site to Plaintiff's vehicle and proceeded to capture a video of the inside of the vehicle. Plaintiff was shocked and as the construction worker walked back past him, asked him, "Where are you from?" To which the worker replied "USA."

95. On November 18, 2017, Plaintiff was near the Rover construction site when he was approached by a security agent told him that he could not be present at a public space nor take pictures or videos, and that the only reason why contaminants would be onsite would be due to someone dumping them into the Rover easement.

96. Michigan law, specifically MCL § 338.1053, requires any company performing security services in the state, to be registered with the Michigan Department of Licensing and Regulatory Affairs (LARA). Throughout the construction phase of the Rover pipeline in Michigan, Defendant Leighton never registered as the security contractor for Defendant ET. Former Leighton employee Robert Heath and Livingston County resident and MRAtETRP member John Machowicz separately filed complaints with LARA against Leighton Security for operating in Michigan without having registered during Rover construction.

97. Defendant Leighton Security is under criminal investigation for nonregistration as of this writing.

98. Defendant Gary Washburn retaliated against Robert Heath by filing "stalking" charges and seeking a restraining order against him, in addition to terminating him, all as a response to his legitimate LARA complaint against Leighton.

**FIRST CAUSE OF ACTION**
**(Violations of 42 U.S.C. § 1985(3))**

99. Plaintiff incorporates fully herein by reference as though rewritten the contents of the foregoing paragraphs 1 through 98.

100. Plaintiff has a right under the First Amendment to express and implement nonviolent opposition to gas megapipelines such as the Rover pipeline, to associate with others to do so, and to petition any level of government for violations or perceived violations of law by such megapipelines. Plaintiff further has a right under the Fourth Amendment to be free from unreasonable searches and seizures and associated threats and harassments to his person and property for the lawful exercise of his rights as a citizen.

101. Plaintiff further is and at all times of which complaint is made had been a citizen of the United States.

102. 42 U.S.C. § 1985(3) states pertinently as follows:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

103. One, some or all Defendants, in combination, cooperation and conspiracy, deprived or attempted to deprive Plaintiff Matthew Shawn Borke of his free exercise of

his aforesaid rights as a citizen of the United States, causing Plaintiff injury in his person and property.

104. Defendants did so by creating a dossier on Plaintiff in the course of his acts in opposition to the Dakota Access Pipeline; by improperly and illegally spying on Plaintiff when Plaintiff was present in the area of Silver Lake, Michigan during the construction of the E.T. Rover pipeline; and by confronting, harassing, and threatening Plaintiff on multiple occasions for his monitoring of, and advocacy against, certain of Rover's construction-related activities.

105. The individual and collective acts of Defendants were aimed at deterring Plaintiff's lawful investigation and inquiry into whether the Rover pipeline was being constructed in such a way as to minimize harm to the environment and the general public and in compliance with state and federal laws and regulations.

106. Defendants, in combination, cooperation and conspiracy, caused the compromise of law enforcement in the Silver Lake area by contracting with the Livingston County Sheriff, effectively privatizing the Sheriff's Department into a private security force for Energy Transfer and Leighton Security and using the Department to broadcast false claims and rumors of ecoterrorism, vandalism and criminal misbehavior against Plaintiff and also as a force for intimidation of those who would oppose the construction of the Rover pipeline.

107. The combined acts and efforts by Defendants were intended to discourage and deter Plaintiff and others from monitoring the damage and negative effects caused by Rover on land, water resources such as wetlands by Rover-caused polluting activities and construction destruction.

108. The pipeline construction caused severe disruptions and disturbances to human residents in and near Rover's path, ranging from serious ground vibrations and noise, to major water withdrawals and transfers to air pollution and water pollution events. Habitat of animal species was destroyed or at threat of destruction by sloppy or excessive measures taken during building of the pipeline. Plaintiff opposed those disruptions and disturbances.

109. Plaintiff and others attempted peacefully to monitor, investigate and obtain evidence and proof of civil and criminal wrongdoing by Energy Transfer, its employees and/or contractors as the pipeline was being built. Plaintiff's efforts in opposition to the Rover pipeline were lawful, protected exercises of his First Amendment rights.

110. As a consequence of Defendants' actions against Plaintiff, Plaintiff was caused damage in the form of embarrassment, humiliation, emotional pain and suffering which is ongoing in nature and lost or foregone economic opportunities.

## SECOND CAUSE OF ACTION
### (State-Law Civil Conspiracy)

111. Plaintiff incorporates fully herein by reference as though rewritten the contents of the foregoing paragraphs 1 through 110.

112. Beginning no later than March 2017 and continuing throughout 2017, Defendants were associated in fact and conspired to discredit and defame Plaintiff as an opponent and public critic of the E.T. Rover pipeline. Defendants combined to commit ongoing acts airmed at harming Plaintiff.

113. Those acts included the lack of lawful registration of Leighton Security under the laws of the State of Michigan and Defendant Leighton's consequent invisibility to the public as the overseer of security for Rover; wire fraud in violation of 18 U.S.C. §

1343; the contracting by Defendant Leighton with the Livingston County Sheriff's Department as a private security adjunct; sundry violations of Michigan environmental law by Defendant ET; and smearing and delegitimization of Plaintiff, using contract law enforcement officers, by slander and defamation when Plaintiff monitored and investigated and in fact, discovered, illicit polluting activity.

114. Each of the conspiratorial acts was for the purpose of deflecting public criticism, minimizing harm to the environment, minimizing threats to public health and crippling citizen opposition to the Rover business plan of constructing a natural gas export mega-pipeline.

115. As a result of the civil conspiracy which was executed and perpetrated by Defendants, Plaintiff has emotional harm, pain and suffering, public humiliation and embarrassment and has suffered economic damages in the form of lost or foregone employment  in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### (State-Law Defamation)

116. Plaintiff incorporates fully herein by reference as though rewritten the contents of the paragraphs 1 through 115.

117. Defendants, acting in combination, published, orally and in writing statements about Plaintiff which were false and defamatory. The statements were published to the public and to law enforcement officers and were not privileged.

118. The statements published by Defendants were the result of Defendants' negligence, lack of due inquiry and investigation into the true circumstances, and said negligence was compounded by Defendants' cynical unwillingness to believe the true circumstances of Plaintiff's monitoring and investigation.

119. The statements comprised defamation *per se.*

120. As a consequence of Defendants' unprivileged publications about Plaintiff, Plaintiff has suffered presumed, actual and general harm and injuries, including public humiliation, embarrassment, pain and suffering and economic damages in the form of lost or foregone employment opportunities..

WHEREFORE, Plaintiff demands the following as and for his damages herein:

1) For his First Cause of Action, general, actual, compensatory and exemplary damages in an amount to be set by the Court and jury;

2) For his Second Cause of Action, general, actual, compensatory and exemplary damages in an amount to be set by the Court and jury;

3) For his Third Cause of Action, general, actual, compensatory and exemplary damages in an amount to be set by the Court and jury;

4) Plaintiff's costs and attorney fees and such other and further relief as the Court may deem necessary and proper in the premises.

Respectfully,

Matthew Shawn Borke, Plaintiff *pro se*
1115 Mason St.
Flint Mi. 48503
Phone (810) 610-8442
Email: borkester@gmail.com

## JURY DEMAND

Plaintiff hereby demands trial by jury of all issues of Complaint that are so triable.

Matthew Shawn Borke, Plaintiff *pro se*