UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW SHAWN BORKE,

                              Plaintiff,                    Civil Action No. 20-cv-12774

v.
                                                           Matthew F Leitman
KELCY WARREN, ENERGY,                                       United States District Judge
TRANSFER, KEVIN MAYBERRY,
GARY WASHBURN, AND LEIGHTON                                 David R. Grand
SECURITY,                                                   United States Magistrate Judge
                              Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTIONS TO DISMISS (ECF Nos. 27, 28)

*Pro se* plaintiff Matthew Shawn Borke ("Borke") commenced this action on

October 13, 2020, against two groups of defendants, (1) Energy Transfer and its Chairman,

Kelcy Warren (the "Energy Transfer Defendants"), and (2) Leighton Security, its CEO,

Kevin James Mayberry, and its Operations Manager, Gary Washburn (the "Leighton

Security Defendants") (all together, the "Defendants").  Broadly speaking, Borke alleges

that defendant Energy Transfer owns the 713-mile "Rover Pipeline," a small portion of

which is located in the vicinity of the Pinckney State Recreation Area in Southeast

Michigan, and that defendant Leighton Security provided security for Energy Transfer

while that portion of the Pipeline was being constructed during 2017-2018.  Borke alleges

that he was actively engaged in monitoring and protesting the Rover Pipeline construction,

and that representatives of Energy Transfer and/or Leighton Security stalked and harassed

him, and wrongfully accused him of attempting to sabotage the Pipeline by dumping

contaminants into the worksite.

Thus, in his operative amended complaint, Borke claims that "because of his environmental activism and his status as a water protector," the Defendants conspired to deprive him of his civil rights in violation of 42 U.S.C. § 1985(3), conspired against him in violation of Michigan state law, defamed him, and falsely accused him of committing a crime.  (ECF No. 26).

The Leighton Security Defendants and the Energy Transfer Defendants have filed separate motions to dismiss, in which they argue that Borke failed to establish that this Court has personal jurisdiction over them, and that his amended complaint fails to allege facts sufficient to state a claim for relief as to any of the causes of action he asserts.  (ECF Nos. 27, 28).[1]  Borke filed a combined response to the motions, and the two defendant groups filed separate replies.  (ECF Nos. 32, 33, 34).

The Court finds that oral argument will not aid it in resolving the motions, and declines to hold a hearing.  *See* E.D. Mich. LR 7.1(f)(2).  For the reasons stated below, the Defendants' motions to dismiss **(ECF Nos. 27, 28)** should be **GRANTED**, Borke's federal conspiracy claim should be **DISMISSED WITH PREJUDICE**, and Borke's state law claims should be **DISMISSED WITHOUT PREJUDICE**.

## I.    Background

### A.    *Amended Complaint Allegations*

#### i.    *Borke*

---

[1] These motions have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b).  (ECF No. 35).

Plaintiff Matthew Borke asserts that he is a "water protector." (ECF No. 26, PageID.187). According to Borke, "[w]ater protectors are activists, organizers, and cultural workers focused on the defense of the world's water and water systems. Water protectors are distinguished from other forms of environmental activists by this philosophy and approach that is rooted in an Indigenous cultural perspective that sees water and the land as sacred." (*Id.*). Borke "is a member of Michigan Residents Against the E[nergy] T[ransfer] Rover Pipeline ('MRAtETRP'), a grassroots group of residents of southeastern Michigan which is involved in sharing facts and raising public awareness about activities concerning Energy Transfer Partners' Rover gas mega-pipeline construction. MRAtETRP has opposed the construction of Rover since public discussions began in 2014." (*Id.*).

Borke alleges that "for several months in 2016-2017 [he] was an activist participant in the Native American protest and occupation against construction of Energy Transfer's Dakota Access Pipeline (DAPL) in and around Cannonball, North Dakota." (*Id.*). Borke alleges that as a result of his participation in the DAPL protest, Energy Transfer was aware of his identity and "monitored [his] activities and whereabouts . . ." (*Id.*, PageID.188). Borke alleges that he was "subjected to attacks involving contract security forces paid by Defendant Energy Transfer. (*Id.*). Specifically, he alleges that he was subjected to attacks by security dogs, pepper spray, and high-pressure water hoses in subfreezing temperatures. (*Id.*, PageId.188-89). Borke also claims that on February 23, 2017, armed men in military fatigues ordered him to come outside the "anti-DAPL encampment[]" he had established and arrested him for "interfering with a government function." (*Id.*, PageID.190-91.) He was prosecuted under state law, though all charges were eventually dropped. (*Id.*)

3

Borke then returned to Michigan where his parents reside, and began attending MRAtETRP meetings along with other "water protectors." (*Id.*, PageID.191). As discussed below, between 2017 and 2018 Borke had numerous interactions with Rover Pipeline construction and security workers, and he alleges he was wrongfully accused of attempting to sabotage the Pipeline by dumping contaminants into the worksite.

### ii. *Energy Transfer, the Rover Pipeline, and Kelcy Warren*

Borke alleges that defendant Energy Transfer is a midstream wholesale oil and gas pipeline services company whose "wholly-owned subsidiary, Rover Pipeline LLC," owns the 713-mile Rover Pipeline, which transports up to 3.25 billion cubic feet per day of domestically produced natural gas. (*Id.*, PageID.182-84). Borke alleges that between 2017 and 2018, a portion of the Rover Pipeline was constructed through 179 miles of land in Michigan. (*Id.*, PageID.182-84). Per a map contained in the amended complaint, a portion of the Rover Pipeline curves around the eastern edge of Silver Lake near the Pinckney State Recreation Area in Southeast Michigan. (*Id.*, PageID.192). Borke alleges that defendant Kelcy Warren was Energy Transfer's CEO and Chairman of the Board at all relevant times, and as such, was responsible for its "day-to-day" management. (*Id.*, PageID.182). However, Borke makes no other salient allegations against Warren.

### iii. *Leighton Security, Mayberry, and Washburn*

Borke alleges that defendant Leighton Security "was a contractor providing security for Defendant [Energy Trading's] projects," including its "projects in North Dakota and Michigan," and that during all relevant times defendants Kevin James Mayberry and Gary Washburn were its CEO and Operations Manager, respectively. (*Id.*, PageID.183, 185).

4

Borke alleges that in all of Leighton Security's filings with Michigan's LARA, from 2013 to 2020, the only corporate officers listed are Mayberry and his wife, Jessica Mayberry, but he makes no other salient allegations as to Mayberry.  (*Id.*, PageID.185).  Although Borke's allegations against Washburn are vague, he alleges that two Livingston County Sheriff's officers admitted to meeting with Washburn at their offices, and that Washburn at least implied that Borke had sabotaged Energy Transfer's property by pouring contaminants into it.  (*Id.*, PageID.212, 217).  Borke also alleges that on October 9, 2017, a "Mr. Vinson" had been parked in front of a house for several hours, and that when confronted by a Washtenaw County Sheriff's Deputy, Vinson stated he was "doing security for Rover Pipeline Construction with Leighton Security."  (*Id.*, PageID.193-94).

> iv.    *Borke's Interactions with Rover Pipeline Construction and Security Workers*

Borke's amended complaint alleges a series of run-ins between he and others with Rover Pipeline construction and security workers, though before delving into those details, some background information is helpful to understanding the rift.  Borke begins by noting that residents in the Rover Pipeline's path "complained repeatedly to police about illegal trespass activities by Defendant Energy Transfer employees," and that this led to "near-constant sheriff's presence around the pipeline construction site . . ."  (*Id.*, PageID.194-95).  Borke contends that during construction of the Rover Pipeline in Ohio, the Tuscarawas River was polluted with millions of gallons of drilling fluid, and that as a result, the Michigan Department of Environmental Quality publicly expressed its hope that "residents can be the agency's extended eyes and ears and report anything unusual while the Rover

5

pipeline is being constructed, such as excessively muddy water." (*Id.*, PageID.195-96). Borke alleges that "MRAtETRP members construed this to mean they had been invited by Michigan's environmental regulatory agency to monitor whether Rover Pipeline construction was complying with environmental regulations, as a public service to their state and local community." (*Id.*, PageID.196).

Whether due to allegedly unfounded rumors of wrongdoing by protestors (such as that some "were seen throwing rocks at Energy Transfer contractors . . .") or legitimate concerns, a significant police presence existed during the Rover Pipeline construction. (*Id.*, PageID.196-97). After Borke moved into a person's residence in the "vicinity of Silver Lake" in July 2017, he had numerous interactions with police. He alleges that Michigan State Police told neighbors about his involvement at Energy Transfer's DAPL construction activities in North Dakota. (*Id.*, PageID.197). Borke claims this placed "growing pressure" on his host, so Borke moved to the Crooked Lake Campground in the Pinckney State Park. (*Id.*). Borke and other MRAtETRP members attended numerous peaceful gatherings, protests, and trainings on "how to recognize a pipeline-construction environmental violation," and he claims that Leighton Security employees (including one named Steve Hernandez) attempted to infiltrate those events by using false names and providing other false information. (*Id.*, PageID.197-98).

Borke claims he was invited to reside on another resident's private property for about a day, from July 15-16, 2017. (*Id.*, PageID.200). On July 20, 2017, Energy Transfer reported that three of its bulldozers that were parked in front of the property had been damaged by someone putting sand and grass in their gas tanks. (*Id.*). Borke returned to

6

the Crooked Lake Campsite, and claims that on July 24, 2017, he observed someone in a disguise, who he believed to be Hernandez, spying on him. (*Id.*, PageID.201). The next day, a Washtenaw County Sheriff's officer appeared at Borke's campsite to advise him that the Sheriff wanted to speak with him. (*Id.*). Borke went to the Sheriff's office on July 25, 2017, and met with the Sheriff and a handful of other officers. Allegedly, "[n]o allegations of sabotage or violence were mentioned during the meeting," and Borke was simply "assure[d]" that "his right to protest was protected." (*Id.*). The next day, Michigan State Police reported more acts of vandalism and sabotage, and neighbors seemed to blame Borke, as they indicated that "if they saw [him], they would call the police." (*Id.*, PageID.202).

On August 26, 2017, Borke and 50 or more other citizens went on a "protest hike" on the open-to-the-public Potawatomi Trail in the Pinckney State Park Recreation Area. (*Id.*, PageID.203). Borke alleges that Energy Transfer had alerted the Washtenaw County Sheriff to the protesters' presence, and that when they arrived at the portion of the trail that crosses Energy Trading's easement, Sergeant Fox told them that if they did not get off the trail, they would all be arrested. (*Id.*). State Police then arrived, but Borke does not allege anyone was arrested. (*Id.*).

About a month later, Borke and another "water protector" were hiking on the Losey Lake Trail, which is a public trail within the Pinckney State Park. (*Id.*). They stopped where the trail abuts a Rover Pipeline easement to take photos of what they believed were "visible environmental and safety violations of Rover's construction permit, including downed safety flags." (*Id.*, PageID.203-04). Borke alleges that an Energy Transfer agent

yelled at them to leave the area and called the Washtenaw County Sheriff.  (*Id.*).  Two deputies arrived and told Borke and his companion that they could not walk on the Losey Lake Trail.  (*Id.*, PageID.204).  When Borke asked whether the deputies could instruct the construction worker to fix the safety flags, they told him they could not.  (*Id.*).  Borke contends that in the deputy's written report about the incident, he wrote, "Protestors [sic] interfering with pipeline installation blocking roadway – refusing to leave."  (*Id.*).

On October 10, 2017, Borke and a companion noticed that water was spilling over one of Energy Transfer's "dewatering" systems on the Rover Pipeline construction site. (*Id.*, PageID.208).  Borke took a photo and left.  (*Id.*).  He and his companion returned the next day and noticed that not only was the spill ongoing, but that it was giving off a strong gasoline odor.  (*Id.*, PageID.209).  They took photos and video, collected samples of the water, and contacted state and federal environmental regulators to report the issue.  (*Id.*). Borke then met with an MDEQ Water Resources Division agent who agreed with him – both then and in later e-mails – that the water coming from the Rover Pipeline easement had a strong odor of gasoline.  (*Id.*).

On October 12, 2017, an MDEQ Remediation and Redevelopment Division Senior Analyst arrived at the location in question and drew several water samples.  (*Id.*).  She instructed an Energy Transfer worker to shut off its pumps, but he refused, contending that the gasoline smell was "swamp gas or 'natural occurring odors.'"  (*Id.*).  The MDEQ analyst left with the samples she took and some that Borke had given her that he had taken the day before.  (*Id.*).  Borke contends that the samples "showed persistent petroleum contamination in the water . . ."  (*Id.*).  The next day, the MDEQ cited Energy Transfer for

violating the Clean Water Act by releasing petroleum contaminants into the local watershed. (*Id.*).

While Energy Transfer shut off the one pump in question, it allegedly continued utilizing other nearby ones. This caused Borke to return to the site and gather more samples that he planned to turn over to the regulators. (*Id.*, PageID.211). Borke's belief was that he was being the "eyes and ears" suggested by the MDEQ, and that by reporting his findings, he was exercising his First Amendment rights. Borke contends that an Energy Transfer third-party contractor saw him collecting the samples, and wrote in a report, "observed the crew shutting down all of the pumps . . . noticed a civilian in the woods off right-of-way near the point where the well-point discharge was entering the wetland." (*Id.*, PageID.211-12). Borke contends that on October 14, 2017, Leighton Security employee Mark Kupiec wrote a "Security Assessment" report in which he asserted, "Protestors have attempted to shut down the pipeline by way of sabotage . . ." and referred to a report he received that "an individual, believed to be Matthew Borke . . . [was seen] pouring something into he water." (*Id.*, PageID.212). The report referenced Borke's membership in the MRAtETRP and the fact that he had published a video of himself and another person at a "protestor camp site in the woods" near the water decontamination site. (*Id.*). A Leighton Security employee then e-mailed a Sheriff's deputy indicating that a person believed to be Borke had been seen "carrying some type of containers which we believe contained some type of oil or fuel which was dumped into the water decon[tamination] tank on site." (*Id.*, PageID.213-14).

Borke alleges that a few days later, a Rover Pipeline construction worker walked

past him near the construction site and began filming the inside of his vehicle.  (*Id.*, PageID.216).  About a month later, on November 18, 2017, while Borke was near the Energy Transfer construction site, he was approached by an Energy Transfer agent who told him he could not be there, even though it was a public space.  (*Id.*).  The person also told Borke that the only reason contaminants would be present is if "someone [was] dumping them into Energy Transfer property."  (*Id.*).

Borke's allegations fast-forward to July 30, 2020, when he alleges a "Security Assessment" was published the public by the Livingston County FOIA Department which claimed Borke was a "saboteur."  (*Id.*).  On August 27, 2020, Borke met with two Livingston County Sheriff's officers who told him that they had met with defendant Washburn in their office, and had "heard Plaintiff Borke had sabotaged Energy Transfer's property by pouring contaminants on their property."  (*Id.*, PageID.217).

## B.    *Case Procedural Posture*

Borke commenced this case on October 13, 2020, against the Energy Transfer Defendants and the Leighton Security Defendants.  (ECF No. 1).  Both sets of Defendants filed motions to dismiss (ECF Nos. 12, 18), and the Court gave Borke an opportunity to file an amended complaint, explaining, "Without expressing any view regarding the merits of the motion to dismiss, the Court will grant Plaintiff the opportunity to file an Amended Complaint in order to remedy the purported pleading defects that Defendants have raised in their motions to dismiss.  Simply put, this is Plaintiff Borke's opportunity to allege any and all additional facts currently known to him, that may cure the alleged pleading deficiencies in the original complaint."  (ECF No. 22, PageID.174-75).  Borke timely filed

the operative amended complaint, with the most salient allegations being the ones discussed above. (ECF No. 26). In that complaint, Borke asserts four causes of action: Count I – Violation of 42 U.S.C. § 1985(3); Count II – State Law Civil Conspiracy; Count III – State Law Defamation; and Count IV – State Law Tort Claim Based on False Report of Crime.

The Leighton Security Defendants and the Energy Transfer Defendants filed separate renewed motions to dismiss that are the subject of this Report and Recommendation. (ECF Nos. 27, 28). The Defendants make similar arguments – that Borke failed to establish that this Court has personal jurisdiction over them, and that his amended complaint fails to allege facts sufficient to state a claim for relief. Borke filed a combined response to the motions, and the two defendant groups filed separate replies. (ECF Nos. 32, 33, 34).

## II.    Legal Standards

### A.    *Motion to Dismiss – Fed. R. Civ. P. 12(b)(2), Lack of Personal Jurisdiction*

Under Fed. R. Civ. P. 12(b)(2), "[t]he plaintiff bears the burden of establishing that jurisdiction exists." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). The district court has discretion to: (1) decide the personal jurisdiction issue on the complaint's allegations alone, along with any affidavits submitted by the parties; (2) permit discovery in aid of deciding the motion; or (3) conduct an evidentiary hearing to resolve any apparent factual questions. *Id.* at 1458. Where the Court does not conduct an evidentiary hearing, the plaintiff need only make a *prima facie* showing of personal jurisdiction. *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510 (6th Cir.2006). In such circumstances, "th[at]

11

burden on the plaintiff is relatively slight." *Air Prod. Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). A plaintiff may make a *prima facie* showing of personal jurisdiction by "establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction." *Lexon Ins. Co. v. Devinshire Land Dev., LLC*, 573 Fed.Appx. 427, 429 (6th Cir. 2014). The Court will "not weigh the facts disputed by the parties but [will] instead consider the pleadings in the light most favorable to the plaintiff . . ." *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012). The Court may, however, also consider the defendant's "undisputed factual assertions." *Id.* "If [the plaintiff] meets that [*prima facie*] burden the motion to dismiss should be denied, 'notwithstanding any controverting presentation by the moving party.'" *Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989) (citation omitted). This prevents a defendant "from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).

Here, none of the parties requested an evidentiary hearing, and, for the reasons discussed below, the Court will decide the personal jurisdiction issues without one.

### B.      *Motion to Dismiss – Rule 12(b)(6), Failure to State a Claim for Relief*

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

12

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556. Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

In deciding whether a plaintiff has set forth a "plausible" claim, the Court must accept the factual allegations in the complaint as true. *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That tenet, however, "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," to prevent a complaint from being dismissed on grounds that it fails to comport sufficiently with basic pleading requirements. *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555; *Howard v. City of Girard, Ohio*, 346 F. App'x 49, 51 (6th Cir. 2009). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Pleadings filed by *pro se* litigants are entitled to a more liberal reading than would be afforded to formal pleadings drafted by lawyers. *See Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007). Nonetheless, "[t]he leniency granted to pro se [litigants] ... is not boundless[,]" *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004), and "such complaints

13

still must plead facts sufficient to show a redressable legal wrong has been committed[.]"
*Baker v. Salvation Army*, No. 09-11424, 2011 WL 1233200, at *3 (E.D. Mich. Mar. 30, 2011).

When a court is presented with a motion testing the sufficiency of a complaint, "it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## III.   ANALYSIS

### A.   *Personal Jurisdiction*

Where, as here, "a federal court's subject matter jurisdiction over a case stems from the existence of a federal question[2], personal jurisdiction over a defendant exists if the defendant is amenable to service of process under the [forum] state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant due process." *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (citation omitted) (alteration in original).  As the Honorable Linda V. Parker of the Eastern District of Michigan recently explained:

> Michigan's long-arm statute extends both general and limited jurisdiction over resident individuals and corporations.  *See* Mich. Comp. Laws § 600.701 (general, individuals); Mich. Comp. Laws § 600.705 (limited, individuals); Mich. Comp. Laws § 600.711

---

[2] In his amended complaint, Borke specifically asserts that this Court's jurisdiction "is based on 28 U.S.C. §§ 1331 and 1343," *i.e.*, federal question jurisdiction.  (ECF No. 26, PageID.183).  He asserts that the Court "has pendent jurisdiction" over his three state law claims pursuant to 28 U.S.C. § 1367 (*id.*, PageID.184), and he fails to allege any of the Defendants' states of citizenship or that the amount in controversy in this case would satisfy the requirements for diversity jurisdiction under 28 U.S.C. § 1332.

14

(general, corporations); Mich. Comp. Laws § 600.715 (limited, corporations).  The following relationships between a corporation and the State are sufficient to establish general personal jurisdiction: (1) incorporation under the State's laws; (2) consent; or (3) "[t]he carrying on of a continuous and systematic part of its general business within the [S]tate."  *Id.* § 600.711.[3]  Limited personal jurisdiction occurs where the lawsuit[] arises out of an act by the defendant, for example "[t]he transaction of any business within the [S]tate[ ]" or doing an act in the state resulting in an action for tort.  *Id.* § 600.715.  Michigan's long-arm statute is coextensive with due process "if the particular acts or status of a defendant first fit within a long-arm statute provision."  *Green v. Wilson*, 565 N.W.2d 813, 816 (Mich. 1997).

*Wang v. Gen. Motors, LLC*, No. CV 18-10347, 2020 WL 4474163, at *5–6 (E.D. Mich. Aug. 4, 2020).

"The Due Process Clause requires that the defendant have sufficient 'minimum contact[s]' with the forum state" so that finding personal jurisdiction does not "offend traditional notions of fair play and substantial justice."  *Conn v. Zakharov*, 667 F.3d 705, 712 (6th Cir. 2012).  For the Court to find sufficient minimum contacts exist, (1) "the defendant must purposefully avail himself of the privilege of acting in the forum state or causing consequence in the forum state," (2) "the cause of action must arise from the defendant's activities there," and (3) "the acts of the defendant or consequences must have

---

[3] Borke makes no cogent argument that this Court has general jurisdiction over any of the Defendants.  The closest he comes seems to be a presumption that this Court has general jurisdiction over Energy Transfer simply because the Rover Pipeline runs through Michigan. However, in *McGregor v. City of Olathe, KS*, 2000 WL 1595871, at *3 (D. Kan. Oct. 16, 2000), the court held, "the alleged ownership of a pipeline that crosses the State of Kansas does not amount to continuous and systematic activity necessary to justify a finding of general jurisdiction." Recognizing that general jurisdiction occurs where "a defendant's contacts with the forum state are of such continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state," *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005), this Court sees no reason to depart from *McGregor's* holding.  Accordingly, the Court will focus its analysis solely on the limited jurisdiction question.

a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Gerber v. Riordan*, 649 F.3d 514, 518 (6th Cir. 2011).

The "purposeful availment" requirement is satisfied when the defendant's contacts with the forum state "proximately result from actions by the defendant *himself* that create a substantial connection" with that state, and when the defendant's "conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 505–06 (6th Cir. 2014) (emphasis in original) (internal quotations omitted). The purposeful availment inquiry focuses on "whether the defendant has engaged in some overt actions connecting the defendant with the forum [S]tate." *Id.* at 506 (internal quotations omitted). To that end, "jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation." *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 699 (6th Cir. 2000). At the same time, when a corporate officer "is actively and personally involved in the conduct giving rise to the claim," the fact that the officer was acting in his or her corporate, rather than personal, capacity will not defeat the exercise of personal jurisdiction over the individual. *Id.* As with any defendant, the Court must determine whether the particular officer's conduct falls within the state's long-arm statute and that the exercise of jurisdiction comports with constitutional due process. *See id.* at 698; *see also Joyner v. MERS*, 451 Fed. App'x 505, 506 (6th Cir. 2011) ("Jurisdiction over an officer of a corporation may not be based on jurisdiction over the corporation; the officer must have purposefully availed himself of the forum.").

In addition, "[u]nder Michigan law, there is a presumption that, 'absent some abuse

16

of the corporate form, parent and subsidiary corporations are separate and distinct entities.'" *Leadford v. Bull Moose Tube Co.*, No. 15-CV-13565, 2016 WL 4089130, at *2 (E.D. Mich. Aug. 2, 2016) (quoting *Seasword v. Hilti, Inc.*, 449 Mich. 542, 547 (Mich. 1995)).  "To rebut this presumption a party must show that a subsidiary is a "mere instrumentality" of the parent." *Id.*  "The factors courts consider under Michigan law are similar to those under federal law, including shared office space, shared board membership, interconnected revenue and capital, support from the parent for the subsidiary in the event of undercapitalization, payroll management, direction of policy and decisions, and shared projects that the parent considers to be its own." *Anwar v. Dow Chem. Co.,* 876 F.3d 841, 851 (6th Cir. 2017) (citing *United Ins. Grp. Agency, Inc. v. Patterson*, Case No. 299631, 2011 WL 5067251, at *2 (Mich. Ct. App. Oct. 25, 2011)).

Against this backdrop, the Court turns to an analysis of the personal jurisdiction question as to each of the Defendants.

### i.  *Energy Transfer Defendants*

#### a.  *Warren*

The personal jurisdiction analysis as to defendant Kelcy Warren is straightforward. Borke's amended complaint contains no salient allegations against Warren that would plausibly support a finding that this Court has personal jurisdiction over him.  In his amended complaint, Borke merely alleges that Warren is "the founder, Executive Chairman and Chairman of the Board of Defendant Energy Transfer," and that Warren "has described his duties as CEO as being responsible for the 'day-to-day management of' Energy Transfer."  (ECF No. 26, PageID.182).  But the mere fact that Warren serves as a

17

corporate officer of Energy Transfer is an insufficient basis for this Court to assert jurisdiction over him. *Balance Dynamics*, 204 F.3d at 699. The amended complaint's only other references to Warren are that in 2014 he was discussing "the ownership structure of Energy Transfer's pipelines" and stated, "Okay let me talk about each one individually. With Rover it's 100% [Energy Transfer]," and that in 2018 he referred to pipeline protestors as people "who need[] to be removed from the gene pool." (ECF No. 26, PageID.184, 187). Nothing about either of these statements suggests any personal connection by Warren with Michigan. Accordingly, this Court lacks personal jurisdiction over Warren, and all of Borke's claims against Warren should be dismissed.

### b. *Energy Transfer*

Defendant Energy Transfer argues that Borke's "Amended Complaint [] makes no allegations regarding Energy Transfer's state of incorporation, whether it transacts business in Michigan, or any specific acts it has taken in Michigan. Instead, [Borke] alleges that 'Energy Transfer's wholly-owned subsidiary, Rover Pipeline applied for a Certificate of Authority to Transact Business in Michigan with Michigan's Department of Licensing and Regulatory Affairs (LARA).' [] [Borke] makes no additional allegations that would suggest this Court may exercise personal jurisdiction over Energy Transfer under an alter-ego theory, or any theory for that matter." (ECF No. 28, PageID.330-31). Energy Transfer goes on to argue, "[t]he only contacts between Energy Transfer and Michigan alleged in the Amended Complaint relate exclusively to the construction of the Rover Pipeline, which runs through West Virginia, Ohio, Pennsylvania, and Michigan en route to supplying energy throughout the Midwest. However, the mere fact that a subsidiary of Energy

18

Transfer operates a pipeline that runs through Michigan is not a basis for general [or limited] jurisdiction." (*Id.*, PageID.333). And, in their reply brief, the Energy Transfer Defendants assert, "[Borke] makes no allegation that Energy Transfer itself constructed or operates the Rover Pipeline, and public records make clear it did not." (ECF No. 33, PageID.1332).

At least on the present record, and liberally construing Borke's allegations, Energy Transfer's arguments lack merit. In his amended complaint Borke alleges that Energy Transfer "organized the permitting, construction, and security of several major interstate pipelines since 2016, ***including . . . the Rover Pipeline*** . . ." (ECF No. 26, PageID.182). Additionally, the 2017 Form 10-K for Energy Transfer Equity, L.P. – Energy Transfer's parent company – states, "In October 2017, [Energy Transfer] completed the previously announced contribution transaction with a fund managed by Blackstone Energy Partners and Blackstone Capital Partners, pursuant to which [Energy Transfer] exchanged a 49.9% interest in the holding company that owns 65% of the Rover pipeline . . . Upon closing, Blackstone contributed funds to reimburse [Energy Transfer] for its pro rata share of the Rover construction costs incurred by [Energy Transfer] through the closing date . . ." (ECF No. 32, PageID.566-67). And, later in the 10-K, Energy Transfer includes the "Rover Pipeline" within a listing of *its* "principal interstate transportation and storage assets," indicating that it owns 32.6% of that pipeline. The Energy Transfer Defendants did not ask for an evidentiary hearing or present an affidavit to dispute Borke's allegation about Energy Transfer's direct involvement with the Rover Pipeline's construction and security, both issues at the heart of Borke's claims.

Finally, Energy Transfer argues that Borke fails the second prong of the "minimum contracts" analysis – that "the cause of action must arise from the defendant's activities" in the forum state – because "[t]he only actions Energy Transfer is alleged to have taken were allegedly taken constructively through agents, contractors, or other entities, but there are no allegations explaining how Energy Transfer would have acted through these third parties." (ECF No. 28, PageID.334-35; *see also* ECF No. 33, PageID.1331-32).  Energy Transfer goes on to argue, "[i]n place of the requisite specific allegations of Energy Transfer's involvement in the actions that form the basis for the Amended Complaint, [Borke] asserts that Energy Transfer conspired with other entities and individuals in Michigan.  But the Sixth Circuit has held that 'totally unsupported allegations of conspiracy cannot constitute sufficient contacts with Michigan to justify an exercise of personal jurisdiction . . .'"  (ECF No. 28, PageID.335) (quoting *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1237 (6th Cir. 1981)).  Liberally construing Borke's complaint, however, he has alleged enough of a nexus between Energy Transfer and his claims to satisfy the "minimum contacts" requirement.

Borke alleges that he had a history with Energy Transfer, that at least some of Energy Transfer's actions related to security for its Rover Pipeline in Michigan were aimed at him in particular, and that other of its actions were part and parcel of the ongoing dispute between it and the local "water protectors."  For example, Borke alleges, "Defendant Energy Transfer through their security teams and advising law enforcement were aware of Plaintiff's identity as a water protector while he was in North Dakota, and they monitored Plaintiff's activities and whereabouts, as well as those of hundreds of other water

20

protectors, during Energy Transfer construction of the Dakota Access Pipeline and Energy Transfer Rover Pipeline." (ECF No. 26, PageID.188). He also alleges that "Energy Transfer called Livingston Sheriffs [in retaliation] against the same homeowner [who had complained about Energy Transfer]," and that "Energy Transfer reported a supposed vehicle sabotage to its contractor, the Livingston County Sheriff's Department. The sabotage supposedly happened in front of the private property Plaintiff Borke had moved away from [a few days prior]." (*Id.*, PageID.194, 200). And, Borke makes numerous allegations about conduct taken against him by Energy Transfer's "agents," whose conduct could ultimately be deemed attributable to Energy Transfer. (*E.g., id.*, PageID.204, 212, 215, 216).

For all of the foregoing reasons, Borke alleged sufficient "minimum contacts" by Energy Transfer with Michigan such that requiring Energy Transfer to defend itself in this action would not "offend traditional notions of fair play and substantial justice." *Conn*, 667 F.3d at 712; *Gerber*, 649 F.3d at 518. Accordingly, the Court has personal jurisdiction over Energy Transfer in this case.

## ii.   *Leighton Security Defendants*

### a.   *Mayberry*

The Court lacks personal jurisdiction over defendant Kevin Mayberry. Borke's only allegations regarding Mayberry in his amended complaint are that Mayberry was Leighton Security's CEO during the time in question, and that Mayberry and his wife were listed as Leighton Security's corporate officers in its LARA filings with the State of Michigan between 2013 and 2020. But the mere fact that Mayberry serves as a corporate officer of

Leighton Security is an insufficient basis for this Court to assert jurisdiction over him. *Balance Dynamics*, 204 F.3d at 699. Accordingly, all of Borke's claims against Mayberry should be dismissed.

> b.    *Washburn*

In arguing that the Court lacks limited jurisdiction over him, Washburn argues, "[t]he complaint makes just scant references to [] Washburn as [an] executive of Leighton Security. And [Borke's] purported issues with regard to Leighton Security actually refer to the acts of the local police department, not Leighton Security itself. That's because Leighton Security didn't actually have any security guards or employees physically present in Michigan, let alone on the Rover pipeline site." (ECF No. 27, PageID.237). Washburn goes on to argue that he "did not create any contacts with the state of Michigan," that he "would be significantly burdened if [he was] to be hauled into a Michigan court based on nothing more than Borke's conclusory allegations of defamation and conspiracy," and that "given the absence of any contacts whatsoever with Michigan, the exercise of jurisdiction over [] Washburn would not be reasonable." (*Id.*, PageID.246, 248). Finally, in his reply brief, Washburn argues that Borke's personal jurisdiction argument relies solely on Washburn's "position[] as [a] corporate officer[] of Leighton." (ECF No. 34, PageID.1340).

Washburn's arguments lack merit because they ignore Borke's allegation that, while in Michigan, Washburn met in person with two Livingston County Sheriff's officers "in their office," and that the two Sheriff's officers "had been working for Defendant Leighton Security and in charge of the contract with them." (ECF No. 26, PageID.217). These

allegations, which Washburn has not denied, constitute sufficient "minimum contacts" with Michigan, and show he was "actively and personally involved in the conduct giving rise to the claim." *Balance Dynamics*, 204 F.3d at 699.  As a result, requiring Washburn to defend himself in this action would not "offend traditional notions of fair play and substantial justice." *Conn*, 667 F.3d at 712; *Gerber*, 649 F.3d at 518.

For all of the foregoing reasons, the Court has personal jurisdiction over Washburn in this case.

### c.   *Leighton Security*

In asserting this Court lacks personal jurisdiction over it, Leighton Security argues:

> Specific jurisdiction concerns claims that arise out of or relate to the defendant's contacts within the forum state.  []  A court may exercise specific personal jurisdiction when the following three factors are met: (1) the defendant must "purposefully avail [itself] of the privilege of acting in the forum state;" (2) "the cause of action must arise from the defendant's activities there;" and (3) "the acts of the defendant . . . must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." []  A plaintiff's "failure to meet any one of the three means that personal jurisdiction may not be invoked."  []
>
> Purposeful availment exists "when the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum State, and when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." []  This requirement ensures that a defendant won't be hailed into a jurisdiction for "random, fortuitous, or attenuated contacts." []
>
> * * *
>
> . . . Leighton Security has no presence or contacts in Michigan.  It has no employees or offices here.  It doesn't provide any security services in Michigan.  And it did not supply any of its employees or security

23

guards on the areas of the Rover pipeline that Borke takes issue with. These facts are insufficient to satisfy the purposeful-availment prong.

(ECF No. 27, PageID.245-46) (internal citations omitted).

After Borke responded by citing a series of acts allegedly taken by "Leighton Security," including that Leighton Security signed a 5-year, $1 billion contract to provide security services for Energy Transfer's pipelines in Michigan and elsewhere, Leighton Security replied, "[a]ll of the acts cited in [Borke's] complaint and response brief only pertain to those done by Leighton's subcontractors – not actual Leighton employees. There's no evidence of actual Leighton employees being present in Michigan.  And Borke hasn't provided any legal authority for the proposition that Leighton can be subject to jurisdiction based on the acts of contractors and sub-contractors."   (ECF No. 34, PageID1340).  Thus Leighton Security's argument seems to boil down to an argument that because it used sub-contractors to provide security for the Rover Pipeline, as opposed to using its own employees, it could not have "purposefully availed" itself of acting in Michigan.  Leighton Security's arguments oversimplify the law and improperly minimize (and in one respect, misstate) its alleged contacts with Michigan.

First, as discussed above, "[l]imited personal jurisdiction occurs where the lawsuit[] arises out of an act by the defendant, for example '[t]he transaction of any business within the [S]tate[ ]' . . ."  *Wang*, 2020 WL 4474163, at *5–6 (quoting M.C.L. § 600.705).  "A single contact with the forum state may suffice for personal jurisdiction if it is directly and substantially related to the plaintiff's claim."  *Heidenbreicht v. Nevilog Inc.*, 700 F. Supp. 2d 820, 825 (E.D. Mich. 2010) (citing *Red Wing Shoe Co., Inc. v. Hockerson–Halberstadt,*

24

*Inc.*, 148 F.3d 1355, 1359 (Fed.Cir. 1998)).  The Michigan Supreme Court and the Sixth

Circuit agree that the salient statute's "transaction of any business" clause is very broad.

*Lanier v. Am. Board of Endodontics*, 843 F.2d 901, 905–06 (6th Cir.[1988] ) (citing *Sifers*

*v. Horen*, 385 Mich. 195, 199 n. 2 (1971)).  Moreover, in evaluating whether a party has

purposefully availed itself of acting in Michigan, it looks not at labels, but at the quality of

the party's contacts here.  As the Honorable David M. Lawson has explained:

> . . . The Sixth Circuit "views the purposeful availment prong of the
> Southern Machine test as 'essential' to a finding of personal
> jurisdiction." [] "Purposeful availment" occurs when "the defendant's
> contacts with the forum state proximately result from actions by the
> defendant himself that create a substantial connection with the forum
> State." [] This requirement "ensures that a defendant will not be haled
> into a jurisdiction solely as a result of 'random,' 'fortuitous,' or
> 'attenuated' contacts, or of the 'unilateral activity of another party or
> a third person.'" [] In that respect, the Sixth Circuit "has found that
> contacts lack quality when they are initiated by the plaintiff rather than
> the defendant, in part because '[t]he unilateral activity of those who
> claim some relationship with a non-resident defendant cannot satisfy
> the requirement of contact with the forum.'" [] On the other hand,
> "parties who reach out beyond one state and create continuing
> relationships and obligations with citizens of another state are subject
> to regulation and sanctions in the other State for the consequences of
> their activities." []
>
> Simply entering into a contract with a party in a state may be
> insufficient to establish jurisdiction over the defendant. [] The law is
> clear that the mere fact that an out-of-state entity contracts with an in-
> state entity and undertakes communication related to that contract
> does not constitute purposeful availment of the forum state for an
> action related to breach of that contract.  Instead, "prior negotiations
> and contemplated future consequences, along with the terms of the
> contract and the parties' actual course of dealing ... must be evaluated
> in determining whether the defendant purposefully established
> minimum contacts within the forum." []

*Heidenbreicht*, 700 F. Supp. 2d at 826.

Examining Leighton Security's contacts with Michigan against these standards makes clear that there is nothing "random," "fortuitous," or "attenuated" about Leighton Security being required to defend itself in Michigan.  First, Leighton Security does not dispute that it contracted with Energy Transfer to provide security services for the Rover Pipeline in Michigan.  (ECF No. 31, PageID.501-02) (5/18/2018 letter from Leighton Security attorney to Michigan Department of Licensing and Regulatory Affairs asserting, "Leighton obtained a contract to provide security guard services [] on an Energy Transfer Corp. pipeline.  Leighton's contract included providing security guard services in Michigan.").  Thus, Leighton Security voluntarily took on the responsibility to see that security services were performed in Michigan.  That Leighton Security elected to discharge that responsibility by engaging a purported "independent contractor" does not diminish its own direct relationship with the Michigan created by its own contract with Energy Transfer.

Second, it is not entirely clear to what extent the persons or entities in Michigan with whom Leighton Security engaged were "independent contractors" as opposed to "agents" of Leighton Security.  *See Furman v. Codiam, Inc.*, No. 2:08-CV-790, 2010 WL 11639695, at *8–10 (S.D. Ohio Sept. 30, 2010)("To begin with, a person may be both an independent contractor and an agent.") (citing Restatement (Second) of Agency § 14N;1 *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213 (6th Cir. 1992)).  To that end, the Court notes that Borke provided at least some evidence that the security personnel wore Leighton Security uniforms and identified themselves as being part of "Leighton Security."

Finally, as discussed above, Defendants have not contested Borke's allegation that

26

Leighton Security's Operations Manager, Washburn, met with Livingston County Sheriff's personnel in Michigan.  Considering the undisputed contract between Leighton Security and the Livingston County Sheriff's Office, it is hardly a stretch to find that meeting constitutes the conducting of business in Michigan by Leighton Security.

For all of the foregoing reasons, Borke alleged sufficient "minimum contacts" by Leighton Security in Michigan such that requiring Leighton Security to defend itself in this action would not "offend traditional notions of fair play and substantial justice."  *Conn*, 667 F.3d at 712; *Gerber*, 649 F.3d at 518.  Accordingly, the Court has personal jurisdiction over Leighton Security in this case.

### B.    Failure to State a Claim for Relief as to § 1985(3) Claim

Borke's sole federal claim is for violation of his rights under 42 U.S.C. § 1985(3). "The original purpose of § 1985(3), which was passed as the Ku Klux Klan Act of 1871, was to enforce the rights of African Americans and their supporters."  *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005).  While the statute has been interpreted to potentially reach beyond that singular purpose, its breadth is still exceedingly narrow.  In *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971), the United States Supreme Court clarified that, far from "interpreting § 1985(3) as a general federal tort law," courts should "giv[e] full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment."  *Griffin*, 403 U.S. at 102.  Thus, the Court held that for a cause of action to lie under § 1985(3), "there must be some racial, or perhaps ***otherwise class-based, invidiously discriminatory animus*** behind the conspirators' action."  *Id.* (emphasis added).

27

The Sixth Circuit, in turn, has held that for a class to be covered by § 1985(3), it "must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender." *Haverstick Enterprises, Inc v Fin Fed Credit, Inc*, 32 F.3d 989, 994 (6th Cir. 1994). More recently, the Sixth Circuit has explained, "[i]n order to state a claim for conspiracy under 42 U.S.C. § 1985(3), a plaintiff must plead: (1) a conspiracy involving two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons the equal protection of the laws[,] and (3) an act in furtherance of that conspiracy (4) that causes injury to person or property, or a deprivation of a right or privilege of a United States citizen," and "must also show the conspiracy was motivated by racial, or other class based animus." *Kuerbitz v. Meisner*, No. 17-2284, 2018 WL 5310762, at *3 (6th Cir. July 11, 2018) (quoting *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996).

Borke fails to state a claim under § 1985(3) because he does not allege the type of "class-based, invidious discriminatory animus" required by *Griffin*. First, some of the allegations on which Borke relies for this claim speak only to Defendants violating his rights as "a citizen," rather than as a member of a class. For example, Borke asserts that he "has a right under the First Amendment to express and implement nonviolent opposition to gas mega pipelines such as the Rover pipeline . . ." and "has a right under the Fourth Amendment to be free from unreasonable searches and seizures and associated threats and harassments to his person and property for the lawful exercise of his rights as a citizen." (ECF No. 26, PageID.217). He then states, "[o]ne, some or all Defendants, in combination, cooperation and conspiracy, deprived or attempted to deprive [him] of his free exercise of

28

his aforesaid rights as a citizen of the United States . . ." (*Id.*, PageID.218).  Clearly, these

allegations do not assert "class-based" discrimination of any kind, and therefore do not

give rise to a claim under § 1985(3).  *Griffin*, 403 U.S. at 102; *Kuerbitz*, 2018 WL 5310762,

at *3.

Second, even where Borke does make allegations about the Defendants taking

concerted action against a "class" of persons, that class, which he describes as "water

protectors," is not one entitled to protection under § 1985(3).  Specifically, Borke alleges:

> 125. The Defendants targeted [him] and his fellow water protectors out
> of irrational hostility and inaccurate stereotypes against water
> protectors and protesters, collectively.  Defendants believed that water
> protectors had no rights that were worthy of respect; that they deserved
> to be met with violence; that they deserved to be driven from public
> spaces; and that they did not deserve equal protection by law
> enforcement. . . .
>
> 126. Defendants sought to deprive [Borke] of rights because of his
> status and activities as a water protector who opposed the ET Rover
> Pipeline.  They conspired with and incited law enforcement to surveil,
> harass, intimidate, and drive Plaintiff from public spaces, thereby
> curtailing his right to peacefully protest, as well as his liberty to move
> freely in public spaces and enjoy freedom to associate with friends in
> the privacy of their homes. . . .

(*Id.*, PageID.218-19).

As the United States Supreme Court has explained, "[w]hatever may be the precise

meaning of a "class" for purposes of *Griffin's* speculative extension of § 1985(3) beyond

race, the term unquestionably connotes something more than a group of individuals who

share a desire to engage in conduct that the § 1985(3) defendant disfavors.  Otherwise,

innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by

simply defining the aggrieved class as those seeking to engage in the activity the defendant

has interfered with.  This definitional ploy would convert the statute into the 'general federal tort law' it was the very purpose of the animus requirement to avoid." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993).  Thus, in *Bray*, where abortion clinics and supporting organizations had sought an injunction against abortion protesters, arguing that the protesters were violating § 1985(3), the Supreme Court held that the plaintiffs could not succeed because "'[w]omen seeking abortions' is not a qualifying class." *Bray*, 506 U.S. at 269.

This reasoning led the Sixth Circuit to find that "in order to be protected by § 1985(3), a class 'must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender . . .'" *Warner v. Greenebaum, Doll & McDonald*, 104 F. App'x 493, 498 (6th Cir. 2004) (quoting *Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994)).  The Sixth Circuit has further refined that principle, and explained that where the proposed "class" is not based on one of those immutable characteristics, but on the group's "conduct," § 1985(3) does not apply.  For example, in *Taylor v. Brighton Corp.*, 616 F.2d 256 (6th Cir. 1980), the Court refused to apply § 1985(3) to a "class" comprised of employees who were discharged for reporting their employer's safety violations.  In reaching that conclusion, the court explained, "Appellants' purported class is nothing more than the group of Brighton employees whose complaints singled them out for discriminatory treatment.  ***It is a group defined by conduct***, but it is not a class cognizable under s 1985(3)." *Taylor*, 616 F.2d at 266 (emphasis added).

Borke's proposed "water protectors" class is also a "group defined by conduct," and

thus not the type of "class" covered by § 1985(3).  Indeed, in *Warner*, 104 Fed. App'x 493, the Sixth Circuit, citing *Bray*, held that environmentalists who opposed a mining company's application for zoning change "simply had not established that they fall within any of the § 1985(3) classes recognized by the Supreme Court or by this court," and upheld the district court's dismissal of the claim.  *Warner*, 104 Fed. App'x at 499.

The cases Borke cites in his response brief are unavailing.  He cites *United Broth. of Carpenters and Joiners v. Scott*, 463 U.S. 825 (1983) for the proposition that "a person does not have to be a racial minority to benefit from §1985(3)'s protection."  (ECF No. 32, PageID.371).  But even assuming that broad contention is correct[4], it is inapposite because his proposed "class" is still one defined by conduct, not immutable characteristics.  *Bray*, 506 U.S. at 269; *Taylor*, 616 F.2d at 266.

Finally, Borke cites *Warner* for its broad statement that "in *Bartell v. Lohiser*, 215 F.3d 550 (6th Cir. 2000), we held that discrimination based on mental disabilities was not actionable under § 1985(3), specifying that § 1985(3) covers only those 'conspiracies against: 1) classes who receive heightened protection under the Equal Protection Clause; and 2) 'those individuals who join together as a class for the purpose of asserting certain fundamental rights.'"  (ECF No. 32, PageID.372).  He goes on to assert that because he and the other "water protectors" have asserted the "fundamental right" of free speech, they should be recognized "under category #2: individuals who join together as a class for the

---

[4] The Supreme Court wrote, "it is a close question whether § 1985(3) was intended to reach *any* class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans."  *United Broth. of Carpenters,* 463 U.S. at 836 (emphasis added).

purpose of asserting fundamental rights . . . [which] include the first 8 amendments of the Constitution." (*Id.*). But Borke's argument ignores that the *Bartell* court referenced only "certain" fundamental rights, and that the *Warner* court held, "[e]ven interpreting *Bartell* liberally, we do not believe that in their efforts to block the zoning change, the plaintiffs can be said to have been 'asserting fundamental rights' sufficient to satisfy § 1985(3)." *Warner*, 104 Fed. App'x at 498-99. Moreover, the "fundamental rights" prong relied on by Borke relates only to members of a "class," which the *Warner* court found "'must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender . . .'" *Warner*, 104 F. App'x at 498. "Water protectors" are not such a "class." And, given *Warner's* rejection of the environmentalists' attempt to state a claim under § 1985(3), it makes no sense to interpret that case as support for Borke's argument that "water protectors" are a class of persons protected under that statute.

For all of these reasons, Borke fails to state a claim for relief under 42 U.S.C. § 1985(3), and that claim should be dismissed with prejudice.

### C.     The Remaining State Law Claims Should be Dismissed Without Prejudice

In light of the recommendation to dismiss Borke's § 1985(3) claim – the sole claim on which this Court's original jurisdiction is asserted, *see supra* at 14 n.2 – the Court should decline to exercise supplemental jurisdiction over Borke's state law claims, and dismiss them without prejudice. *See* 28 U.S.C. § 1367(c) (providing that a court "may decline to exercise supplemental jurisdiction," if it has "dismissed all claims over which it has original jurisdiction"); *Jesse Young v. Prison Health Servs.*, No. 16-CV-13016, 2017 WL 2793956, at *2 (E.D. Mich. June 28, 2017) ("the dismissal of the claims over which the

32

federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court.") (citing *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002)).

## IV.   CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that Defendants' motions to dismiss (**ECF Nos. 27, 28**) be **GRANTED**, Borke's claim under 42 U.S.C. § 1985(3) be **DISMISSED WITH PREJUDICE**, and Borke's state law claims be **DISMISSED WITHOUT PREJUDICE**.

Dated: December 27, 2021                                           s/David R. Grand
Ann Arbor, Michigan                                               DAVID R. GRAND
                                                                           United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to

be served upon this magistrate judge.  A party may respond to another party's objections

within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C.

§636(b)(1).  Any such response should be concise, and should address specifically, and in

the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 27, 2021.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager